Louis L. Chodoff (Attorney I.D. # 037281988)
Christopher T. Cognato (Attorney I.D. # 020292009)
BALLARD SPAHR LLP
A Pennsylvania Limited Liability Partnership
210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1163
Telephone: 856.761.3400

*Attorneys for Plaintiff Freedom Mortgage Corporation*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FREEDOM MORTGAGE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>CROSSCOUNTRY MORTGAGE, INC.,<br><br>Defendant. | Civil Action No.: _____ |

## COMPLAINT

Plaintiff, Freedom Mortgage Corporation ("Freedom"), for its Complaint against CrossCountry Mortgage, Inc. ("CrossCountry") alleges as follows:

**I.   THE PARTIES**

1. Freedom is a corporate entity, incorporated in New Jersey, with a principal place of business located at 907 Pleasant Valley Ave, Suite 3, Mount Laurel, Burlington County, New Jersey 08054.

2. Freedom is informed and believes that CrossCountry is, and at all times herein mentioned was, an Ohio for-profit corporation conducting business in the State of New Jersey. Its corporate headquarters is located at 6850 Miller Road, Brecksville, Ohio 44141.

## II.  JURISDICTION AND VENUE

3. This Court has original jurisdiction over Count One of this action pursuant to 28 U.S.C. § 1331 because it alleges violations of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*

4. This Court has supplemental jurisdiction over Counts Two through Six of this action pursuant to 28 U.S.C. § 1367(a) because the claims asserted therein are so related to the claims set forth in Count One that they form part of the same case or controversy under Article III of the United States Constitution.

5. This Court also has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court may properly maintain personal jurisdiction over CrossCountry because CrossCountry's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice.

7. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

### III. BACKGROUND

8. In this action, Freedom seeks injunctive and other equitable relief to prevent and restrain CrossCountry from interfering with Freedom's contractual relations with employees, customers, and clients and with its prospective business advantage.

9. Freedom also seeks damages, costs, and attorneys' fees it has incurred because of CrossCountry's tortious conduct described herein.

10. Freedom is a mortgage company that, at all times relevant herein, maintained three (3) branches in Las Vegas, Nevada.

11. Those branches were known as the Spring Mountain Branch, the Post Road Branch, and the Eastern Branch, respectively, based on their locations.

12. Freedom employees at those branches are responsible for soliciting, closing, and processing retail mortgages in the region.

13. CrossCountry is a mortgage company and a direct competitor of Freedom in the Las Vegas market. CrossCountry is licensed in all fifty (50) states, including New Jersey, and operates and/or maintains branches in New Jersey.

14. Because of Cross Country's conduct, and that of individuals working at its direction and on its behalf, Freedom's Spring Mountain Branch closed in April 2017 after then-Freedom employees and former employees surreptitiously converted it into a CrossCountry branch.

15. Before such conversion took place, CrossCountry solicited those Freedom employees and former employees to leave Freedom and to access and share with CrossCountry, Freedom's confidential and proprietary information.

16. Such Freedom employees and former employees were also prohibited by law from accessing Freedom's computers, computer networks, and computer systems in order to

cause Freedom damage and loss and from competing with Freedom while still ostensibly acting as Freedom employees.

17. CrossCountry was aware or should have been aware of all of these restrictions.

18. Nevertheless, CrossCountry persisted in a months' long campaign to take over a Freedom branch, hire away Freedom employees, and direct those employees to use Freedom resources to divert Freedom clients and customers to CrossCountry.

19. This action seeks to stop CrossCountry's unlawful activities, to deprive it of the fruits of those activities, and to remedy the damages, fees, and costs that its actions have imposed on Freedom to date.

## IV. GENERAL ALLEGATIONS

### A. **Freedom's Contracts with Its Former Employees**

20. Ed Kami (also known as Ed Kamibayashiyama) ("Kami") became an employee of Freedom on August 11, 2014.

21. On February 1, 2016, he was promoted to the position of Senior Vice President – Division Manager.

22. In this capacity, he was responsible for managing day-to-day operations in Freedom's Retail Southwest Division, including its three (3) Las Vegas branches, and for supervision over all of the employees therein.

23. On February 22, 2016, in consideration of his promotion and continued employment by Freedom, Kami signed an Employment Agreement, a copy of which is attached as Exhibit A (the "Kami Agreement").

24. The Kami Agreement contains the following provision:

> Employee agrees that during his/her employment with Freedom Mortgage and for a period of eighteen (18) months after the

> termination of employment with Freedom Mortgage . . . Employee will not on behalf of himself/herself or on behalf of any other person, firm or entity, directly or indirectly solicit any of Freedom Mortgage employees with whom Employee worked in the 6 months preceding Employee's termination, to leave Freedom Mortgage or form or join another entity.

Exhibit A at § VI(E).

26. The Kami Agreement also states:

> Employee agrees that during his/her employment with Freedom Mortgage and for a period of eighteen (18) months after the termination of employment with Freedom Mortgage . . . Employee will not on behalf of himself/herself or on behalf of any other person, firm or entity, directly, or indirectly divulge the confidential material of Freedom Mortgage, or the names and addresses of any of the customers, clients, Business Partners, or patrons of the Company to any person, firm or corporation. The employee also agrees that after termination of employment with the Company, the Employee will not, either directly or indirectly call upon, solicit, divert, or take away or attempt to solicit, divert, or take away, any of the customers, business, Business Partners or patrons of the Company upon whom the employee called or solicited, or became aware of during his/her employment or became acquainted with while employed with the Company. Employee also agrees not to solicit other employees' of the company to leave the company and to work for the Employee, or any other firm, person, or association.

*Id.* § VI(G).

26. By signing the Kami Agreement, Kami agreed that the post-employment covenants set forth in Article VI of the Kami Agreement would "not interfere with or unduly limit his/her ability to obtain suitable alternative employment following termination of employment" and that the covenants were "reasonable and necessary." *Id.* § VI(H).

27. By signing the Kami Agreement, Kami also agreed that in the event of his violation of any of these restrictions, Freedom "shall be entitled to the cost of all legal fees and expenses incurred in investigating and enforcing the covenants contained herein, including fees and expenses incurred prior to filing suit." *Id.*

28. In fact, Kami agreed to all of the provisions of the Kami Agreement by signing the Kami Agreement and accepting his promotion to the position of Senior Vice President – Division Manager and continued employment with Freedom.

29. Kami resigned from his position with Freedom on February 25, 2017.

30. He immediately took a similar position with CrossCountry.

31. Christina Singleton ("Singleton") became an employee of Freedom on September 22, 2014.

32. She held the position of Recruiter for Freedom's Southwest Division.

33. In her capacity as a recruiter, Singleton reported directly to Kami.

34. She was responsible for recruiting potential employees to Freedom, including to its three (3) Las Vegas retail branches.

35. On September 19, 2014, in consideration of her continued employment by Freedom, Singleton signed a Confidentiality Agreement (the "Singleton Agreement"), a copy of which is attached as Exhibit B.

36. The Singleton Agreement contains the following provision:

> Employee . . . agrees that during the period of eighteen months immediately after the termination of his/her employment with the Company, Employee will not either directly or indirectly make known or divulge the Company's Confidential Material, or the names and addresses of any of the customers, clients, Business Partners or patrons of the Company to any person, firm or corporation.

Exhibit B at § 6.

37. The Singleton Agreement also states:

> Employee also agrees that, after termination of employment with the Company, the Employee will not, either directly or indirectly call upon, solicit, divert, or take away, or attempt to solicit, divert or take away, any of the customers, business, Business Partners or patrons of the Company upon whom the Employee called or

solicited, or became aware of during his/her employment or became acquainted with while employed with the Company.

*Id.*

38. The Singleton Agreement also states, "Employee . . . agrees not to solicit other employees[ ] of the Company to leave the Company and to work for the Employee, or any other firm, person or association." *Id.*

39. Singleton agreed to all of the provisions of the Singleton Agreement by signing the Singleton Agreement and continued employment with Freedom.

40. Singleton resigned from her position with Freedom on February 22, 2017.

41. She immediately took a similar position with CrossCountry.

**B.   CrossCountry Solicits Other Freedom Employees to Defect to CrossCountry and to Divert Freedom Customers to CrossCountry Using Freedom Computers and Computer Systems.**

42. Freedom gives employees in its Las Vegas branches, including Kami during his employment with Freedom, access to computers, computer network, email, and other computer systems, all of which are connected via a wireless network that Freedom maintains, in order to conduct Freedom business.

43. Freedom provided Singleton with a computer in order to work out of her home. Freedom also provided her with access to its email and other computer systems.

44. Freedom prohibits employees from using its computers, computer network, email, computer systems, and computer-related equipment to share confidential, proprietary, and other business-related information with competitors, prospective employers, and other third parties.

45. Before employees are permitted to use Freedom's computers, computer network, email, and other computer systems, they must affirm that they understand the limits of the

authorization Freedom permits for such use and agree that the systems and equipment may only be used to transact company business.

46. In addition, Freedom maintains and enforces strict policies that protect its confidential, proprietary, and other business-related information from disclosure to third parties.

47. Freedom's computers, email, and computer systems are used in order to engage in interstate commerce and to connect employees with Freedom's New Jersey-based staff and management.

48. The computer systems and email available to employees in Freedom's Las Vegas branches and to Singleton when she was employed by Freedom allow employees to access data housed in Freedom's New Jersey-based computers, computer network, and computer systems.

49. Upon information or belief, in or around mid-February of 2017, Singleton and Kami decided to leave Freedom for CrossCountry.

50. While still employed by Freedom but acting on behalf of CrossCountry, Kami and Singleton, separately and/or in concert, began to recruit, solicit, encourage, and/or entice other Freedom employees to leave Freedom and join them at CrossCountry.

51. On February 14, 2017, Kami used his Freedom-owned computer and computer network and Freedom-owned email account to send to Singleton and several other then-Freedom employees a recurring appointment entitled "CCM Recruiting Power Hour" to take place every Tuesday afternoon.

52. At the same time, and while still employed by Freedom, Kami was using his access to Freedom's computers and email systems to act as CrossCountry's agent to divert customers and potential customers of Freedom away from Freedom and to CrossCountry.

53. Indeed, on February 22, 2017, Kami used his Freedom computer and computer network and Freedom email account to send a marketing services agreement on behalf of CrossCountry to a property developer.

54. On February 23, 2017, Kami used his Freedom computer and computer network and Freedom email account to invite several then-current Freedom employees to look at potential office space on February 27, 2017.

55. Upon information and belief, Kami and the other then-current Freedom employees he invited were intending for that space to be used by CrossCountry for purposes of competing with Freedom.

56. Upon information and belief, while still employed by Freedom but acting on behalf of CrossCountry, Kami and Singleton were reviewing potential office space for their CrossCountry business.

57. Upon information and belief, Kami and/or Singleton, on behalf of CrossCountry, made formal employment offers to the following Freedom employees: Keymoar Lopez, Joel Martinez, Ira Stark, Tim Bonham, Mike Presenti, Adam Haupt, Adriana Villegas-Molina, Anakaren Alcantar-Zavala, Brenda Neavez, John Ingram, Jia Mei Wang, Chris Feng, Renhe Du, Isabel Aguirre, Juanita Lopez, and Jen McClain.

58. As a direct result of the solicitation of Kami and/or Singleton on behalf of CrossCountry, Keymoar Lopez, Ira Stark, Tim Bonham, John Ingram, Jia Mei Wang, Chris Feng, Renhe Du, and Isabel Aguirre have all left Freedom and become employed by CrossCountry.

59. Kami, Singleton, and those Freedom employees CrossCountry was actively recruiting also solicited Freedom's customers and clients, often using the Freedom employees'

access to Freedom email and computer systems to divert customers to CrossCountry and to communicate with CrossCountry personnel about potential customers and clients.

60. Kami, Singleton, and those Freedom employees CrossCountry was actively recruiting took all such actions described in paragraph 58 above on CrossCountry's behalf and/or at CrossCountry's direction.

61. By way of example only, upon information and belief, CrossCountry directed several then-Freedom employees to transfer mortgages from Freedom to CrossCountry.

62. To do so, then-Freedom employees, acting at the direction and/or on behalf of CrossCountry, used Freedom computers, computer network, computer systems, and email to access Freedom's data and information to inform Freedom customers and prospective customer that they were leaving for CrossCountry and to service those customers and prospective customers on behalf of CrossCountry.

63. Keymoar Lopez, Jia Mei Wang, Chris Feng, Renhe Du, and possibly others used their access to Freedom computers, email, computer network, and computer systems to transfer clients from Freedom to CrossCountry at CrossCountrys' direction and on CrossCountry's behalf.

64. On or about April 3, 2017, CrossCountry personnel accessed the computers, computer networks, and computer systems maintained by Freedom in what to that point had been Freedom's Spring Mountain branch.

65. Then-Freedom employees Jia Mei Wang, Chris Feng, and Renhe Du, all acting on CrossCountry's behalf, assisted CrossCountry personnel in disabling Freedom's systems and creating a wireless network specifically for the purpose of conducting CrossCountry business in the facility.

66. CrossCountry personnel and Freedom employees acting on CrossCountry's behalf and at CrossCountry's direction used Freedom computers and other hardware to create this network, which they entitled "CrossCountry."

67. Freedom had been using the facility until the previous Friday, March 31, 2017, without having been informed by the property's landlord – then-Freedom employee Jia Mei Wang – that she planned to convert the facility to a CrossCounty office.

68. When Freedom discovered the "CrossCountry" network was created using its computers and computer systems, it disabled all of its hardware in the facility in order to remove the network, a process that entailed several hours of work by Freedom staff.

C. **Freedom's Remedial Efforts**

69. Upon learning of Singleton's violations of the Singleton Agreement and other tortious conduct, Freedom sent her a letter on March 1, 2017, reminding her of her post-termination obligations and demanding that she desist from unlawful conduct directed at Freedom.

70. Freedom received no response.

71. Upon learning of Kami's violations of the Kami Agreement and other tortious conduct, Freedom sent him a letter on March 2, 2017, reminding him of his post-termination obligations and demanding that he desist from unlawful conduct directed at Freedom.

72. On March 10, 2017, Freedom sent a copy of its March 2 Kami letter to CrossCountry.

73. Freedom received no response from CrossCountry.

74. On April 3, 2017, Kami's attorney responded to Freedom, denying that his client violated the Kami Agreement. Nevertheless, upon information and belief, his client and others

working on CrossCountry's behalf continued to access Freedom's computers and computer systems in order to engage in the tortious conduct described above.

75.  Upon information and belief, CrossCountry continues, both directly and indirectly, to solicit Freedom employees, customers, and prospective customers.

76.  Upon information and belief, Kami, on CrossCountry's behalf, has continued to solicit Freedom employees in Freedom's Melville, New York location to terminate their employment with Freedom in order to join CrossCountry, in violation of the Kami Agreement.

## COUNT ONE
### Breach of Computer Fraud and Abuse Act

77.  Freedom incorporates all paragraphs of this Complaint as though fully set forth herein.

78.  Freedom's computers and the information stored in those computers are used in interstate commerce.

79.  By virtue of the aforementioned conduct CrossCountry violated the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 *et seq.*, by intentionally, without authorization, and exceeding the authorization then-Freedom employees acting as CrossCountry's agents had been granted, accessing Freedom's computers and computer network and obtaining Freedom's information from them, including but not limited to Freedom's electronic files relating to its customers.

80.  CrossCountry committed such violations of the CFAA through its agents, including but not limited to Kami, Singleton, and the other then-Freedom employees whom CrossCountry solicited to access Freedom's computer systems, in order to obtain information on CrossCountry's behalf.

81. CrossCountry also violated the CFAA by intentionally and without authorization accessing Freedom's computers and computer network and causing damage and loss.

82. CrossCountry committed such violations of the CFAA through its agents, including but not limited to Kami, Singleton, and the other then-Freedom employees whom CrossCountry solicited to access Freedom's computer systems, in order to cause damage and loss on CrossCountry's behalf.

80. CrossCountry's conduct has resulted in damages to Freedom, including the loss of its information concerning customers and prospective customers, stored on its computers and computer network.

81. CrossCountry's conduct has resulted in loss to Freedom, including the costs associated with investigating CrossCountry's unlawful access to its computers and computer network and attempting to remedying that access.

## COUNT TWO
### Violation of New Jersey's Computer-Related Offenses Act

82. Freedom incorporates all paragraphs of this Complaint as though fully set forth herein.

83. By virtue of the aforementioned conduct, CrossCountry violated the New Jersey Computer-Related Offenses Act ("NJ CROA"), N.J.S.A. 2A:38A-1 *et seq.*, by purposefully, knowingly, without authorization, and exceeding the authorization then-Freedom employees acting as CrossCountry's agents had been granted, accessing Freedom's computers, computer systems, and computer network.

84. CrossCountry committed such violations of the NJ CROA through its agents, including but not limited to Kami, Singleton, and the other then-Freedom employees whom

CrossCountry solicited to access Freedom's computer systems, in order to obtain information on CrossCountry's behalf.

85. By virtue of the aforementioned conduct, CrossCountry also violated the NJ CROA by purposefully, knowingly, recklessly, and without authorization altering and damaging Freedom's computer, computer equipment, computer systems, and computer network.

86. CrossCountry committed such violations of the NJ CROA through its agents, including but not limited to Kami, Singleton, and the other then-Freedom employees whom CrossCountry solicited to access Freedom's computer systems, in order to obtain information on CrossCountry's behalf.

87. CrossCountry's conduct has resulted in damages to Freedom, including the loss of its information concerning customers and prospective customers, stored on its computers and computer network.

88. Because Freedom is headquartered in New Jersey, much of the damage caused by CrossCountry's conduct occurred in New Jersey.

89. CrossCountry's conduct has resulted in loss to Freedom, including the costs associated with investigating CrossCountry's unlawful access to its computers and computer network and attempting to remedying that access.

## COUNT THREE
### Tortious Interference with Contract

90. Freedom incorporates all paragraphs of this Complaint as though fully set forth herein.

91. A valid contractual relationship exists between Freedom and Kami and between Freedom and Singleton.

92. CrossCountry knew or should have known of these contractual relationships.

93. CrossCountry intentionally and without justification interfered with the contractual relationship between Freedom and Kami and that between Freedom and Singleton, and also induced, encouraged, and assisted Kami and Singleton to breach their contracts with Freedom.

94. Freedom has suffered and will continue to suffer injury and irreparable harm as a result.

## COUNT FOUR
## Unfair Competition

95. Freedom incorporates all paragraphs of this Complaint as though fully set forth herein.

96. By virtue of the acts described above, CrossCountry has unfairly misappropriated the employees of Freedom.

97. It has also sought to unfairly capitalize on the goodwill of Freedom by employing unfair and deceptive practices intended to hinder, delay, divert, or prevent Freedom from fairly competing with CrossCountry.

98. CrossCountry has committed these acts maliciously and for the sole purpose of inflicting harm on Freedom or to benefit itself at the expense of Freedom.

99. Freedom has suffered and will continue to suffer injury and irreparable harm as a result.

## COUNT FIVE
### Unjust Enrichment

100. Freedom incorporates all paragraphs of this Complaint as though fully set forth herein.

101. CrossCountry has been unjustly enriched at the expense of Freedom.

102. Freedom has suffered and will continue to suffer injury and irreparable harm as a result.

## COUNT SIX
### Tortious Interference with Prospective Business Advantage

103 Freedom incorporates all paragraphs of this Complaint as though fully set forth herein.

104. Freedom has an interest in protecting its customer relationships, potential customer relationships, trade secrets, and confidential business information.

105. CrossCountry knew of Freedom's interests in protecting its customer relationships, trade secrets, and confidential business information.

106. CrossCountry intentionally and without justification interfered with the relationships between Freedom and its customers and prospective customers.

107. Freedom has suffered and will continue to suffer injury and irreparable harm as a result of CrossCountry's breach.

**WHEREFORE,** Plaintiff Freedom Mortgage Corporation, being threatened with the continuance of serious and irreparable injury, demands judgment in its favor and against Defendant CrossCountry Mortgage, Inc.:

1. That CrossCountry (as well as all persons and entities acting for or on its behalf, on in concert with it), be permanently restrained from, directly or indirectly:

A. Soliciting, diverting away, or attempting to solicit or divert away the customers and prospective customers of Freedom; and

B. Retaining, using, possessing, or disclosing to any person, or facilitating or assisting any person to use, the confidential and proprietary information of Freedom, including but not limited to the identities of its customers and the details of their needs, including but not limited to customer contact information, proposals in final and draft forms, forecasts, invoices, service orders, service information, profit margins on products, the cost to produce products, pricing structure, manufacturing capabilities and capacities, and package printing capabilities and capacities.

2. That CrossCountry and its employees and/or agents be ordered to return immediately to Freedom any property of Freedom in their possession, including but not limited to any confidential and proprietary information or customer data or other information pertaining to or obtained from Freedom;

3. An award of damages, in an amount to be determined at trial, incurred by Freedom as a result of the unlawful actions of CrossCountry;

4. An accounting and disgorgement of any profits earned by CrossCountry as a result of its unlawful activities;

5. Punitive damages against CrossCountry;

6. Costs and disbursements of this action, including reasonable attorney's fees, costs of investigation, and expenses; and

7. Other such relief as the Court may deem equitable and just.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

                                                                                          s/ Louis L. Chodoff
                                                                     Louis L. Chodoff
                                                                     Christopher T. Cognato
                                                                     BALLARD SPAHR LLP
                                                                     A Pennsylvania Limited Liability Partnership
                                                                     210 Lake Drive East, Suite 200
                                                                     Cherry Hill, NJ  08002-1163
                                                                     Telephone:  856.761.3400

DATED:  November 10, 2017                    Attorneys for Plaintiff Freedom Mortgage Corporation

## LOCAL RULE 11.2 CERTIFICATION

The undersigned hereby certifies that this matter in controversy is not the subject of any other action pending in any court, arbitration, or administrative proceeding.

                                               s/ Louis L. Chodoff
Louis L. Chodoff
Christopher T. Cognato
BALLARD SPAHR LLP
A Pennsylvania Limited Liability Partnership
210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1163
Telephone: 856.761.3400

DATED: November 10, 2017

Attorneys for Plaintiff Freedom Mortgage Corporation